URBANA CONSTRUCTION COMPANY, Appellant, v. WEBSTER
    COUNTY-CALHOUN COUNTY JOINT DRAINAGE DISTRICT NO.
    16-31 et al., Appellees.

CONTRACTS:  Engineering Terms—Flexible Meaning—Oral Under-
    standing—Practical Construction.  When an engineering term .
    capable of different meanings (for instance ''rock work'' in 'a
    contract for excavation) is used in a contract, evidence as to the
    oral understanding at the time the contract was under con-
    sideration as to the sense in which the term was used is quite
    persuasive, especially when a claim based on a counter construc-
    tion was concealed until the work was done.

*Appeal from Webster District Court.*—HON. R. M. WRIGHT,
                    Judge.

              THURSDAY, MARCH 11, 1915.

    ACTION to recover an alleged balance due under a con-
tract for the construction of a tile drain in a joint drainage
district comprising lands in Webster and Calhoun Counties.
Trial was had on the equity side of the court. Relief was
awarded by the trial court as to one small item but was denied
as to the principal question in controversy. Plaintiff appeals.
—*Affirmed.*

    *Price & Joyce,* for appellant.

    *Mitchell & Fitzpatrick, F. A. Grosenbaugh* and *John W.
Jacobs,* for appellees.

    EVANS, J.—The plaintiff was a partnership consisting of
one Stewart and Van Wegen. It is represented herein by

Stewart alone, who acquired the interest of his co-partner.
The defendants are the supervisors of the

1. CONTRACTS: engineering terms: flexible meaning: oral understanding: practical construction.

two counties comprising the joint drainage board which entered into the contract sued on. In May, 1909, the plaintiff entered into a written contract with the defendants for the construction of the main tile drain for the joint district. The contract was based upon a bid which the plaintiff had filed about a year prior. This bid and the contract in pursuance thereto provided for the payment to the plaintiff of a lump sum of $32,200.00. Plaintiff's bid contained the following notation or qualification: "For what is considered rock work $3.00 per cubic yard." The present action is based upon this proviso in the bid. The claim is that plaintiff did 1,121 cubic yards of rock work and that he is entitled to recover $3,363.00 therefor. The defendants deny that any "rock work" was done within the contemplation of the contract as the same was understood and construed by both parties by mutual oral agreement and as the same was construed by the parties by their conduct throughout the entire period of performance.

By the testimony for the plaintiff, it is made to appear that in the course of the work he encountered many large rocks or boulders, the removal of which involved great labor and expense, and that the same was rock work within the meaning of the contract.

By the testimony for the defendants, it is made to appear that while the bid was under consideration by the drainage board, he was asked to state what he "considered rock work." Objection was also made by the board to having the term applied to boulders, which were conceded to be present upon and in the ground to a greater or less extent. That the plaintiff thereupon stated that he did not consider boulders as rock work and that the term as used in his bid was intended to apply only to solid or ledge rock. In engineering parlance, "rock work" is concededly a flexible term and may be applied

to loose rock or to solid rock. The cost of removing solid rock, however, is usually double that of removing loose rock. The term, however, is not usually applied to small stones of smaller dimensions than a cubic yard. The performance of the contract occupied a period of about two years, beginning in October, 1909. The alleged rock was encountered in the fall of 1910 and continued through the winter and until May or June. The engineer in charge furnished the plaintiff with the monthly estimates of the amount of work done, as provided by Sec. 1989-a9. These were filed by the plaintiff with the auditor and he drew thereon the ''80% of the value of the work done according to the estimate,'' as provided in said section. These estimates never contained any reference to rock work and no member of the drainage board knew that the plaintiff was doing any rock work or claiming to do any at any time during the period of performance. Their first knowledge of such claim was in December, 1911, when the claim was presented. The claim then made, however, was so made upon the estimates and favorable recommendation of the engineer. Upon the trial the engineer was a witness for the plaintiff. The testimony of the plaintiff and the engineer is in harmony as to the fact that rock work was done and is in harmony also as to the reasons why it was never included in any of the current estimates. This reason was that the engineer believed and so informed the plaintiff that if a claim were made, the board would reject it. It was also said that the members of the board would probably want to examine such work for themselves and would not accept the report of the engineer thereon. It was, therefore, mutually agreed between the plaintiff and the engineer that it would be better for the plaintiff to defer making any claim until after the job was completed. This was the course pursued. The yardage which is now claimed for as rock work was included in the estimates as earth work and its value was estimated at the contract price of 36c per linear foot, which would amount to a little more than $1.00 per yard. At the time that the

claim was first brought to the attention of the drainage board,
the drain had been fully covered and most of it was plowed
and cropped for the season of 1911.   The testimony of the
engineer Freimuth is important and we here set forth suffi-
cient thereof to indicate its general character:

I think both Mr. Stewart and I were too easy, too slow.
I made many reports during the construction of that im-
provement, concerning changes, and changes in the laterals,
and things of that sort.   I don't know how many, but there
was a lot of them.   When I said that we had been too easy,
I meant to be understood that we had been too easy with our-
selves, by us not giving any estimates on those rock while it
was due.   The Board were in the habit of holding up or re-
jecting my reports.   I had never made an estimate on rock
work before.   I never had charge of rock work before that
called for an estimate.   I did not know that if I made a report
or estimate on rock work that the Board would examine the
work.   I thought they would reject my statement, and that
they would make an investigation, and my reason in not mak-
ing that report was the belief that the joint Boards would
reject it, but I expected and I had in mind that when the
end came and I covered the whole matter in one estimate,
that they would accept it.   I expected they would accept an
estimate covering the entire work, but would reject the month-
ly estimates.   My final report was made after the work was
finished, the ditch filled in, and part of the land broken up.
I did not have in mind of destroying the evidence of the con-
dition of the work.   I thought it was as proper a time to make
the final report then as at any other time before.   I think so
far as the district was concerned that the parties all knew it
and examined it that were interested.   I talked to them a good
deal, yes.   I talked to D. S. Coughlan, a member of the Board.
I never met him on the work.   I was before the joint meeting
during the progress of the work probably a time or two.   I
talked over with the Board about the work not being pro-

gressing. That the work was not going very rapidly. I did not speak of rock work. The subject we talked of was the bulkhead. There was a washout at the upper end of the ditch. They made the ditch very wide, and we couldn't get started until we got a bigger bulkhead than was planned in the preliminaries. I was out on the work about twice a week during this progress from Knierim. I found that the tile was laid, and the ditch immediately filled in on top of the tile from about eighteen inches to four feet in. It varied. That was the condition of this ditch the various times I saw it, but it was not filled up to the rock line, not filled up as high as the rock came. I saw the rock and assumed that it extended to the bottom.

Q. And it is upon that basis that you have made your report for this thirty-three or thirty-four hundred dollars for work, on the fact that you could see a little of the rock, and assumed that it extended down to the bottom of the ditch?

A. Well, in inspecting the tile, I could hardly find places I could get through to the tile with my sounding rod, is how I know that the rock extended all the way down.

After the ditch was filled I had a rod that I stuffed down. I had some difficulty in getting it down, and I said that was rock. We used spades also in digging down through the rock to the tile. We would dig down through the filled ditch to the tile, and opened it up every three feet. In various places we did, and opened it up. We uncovered them for long stretches in places, after they had been filled once. My assistant helped me. His name was H. E. Stewart and some of Stewart's men.

Q. That is Stewart's men first filled in the ditch, and then, when you came along, they unfilled it, and looked at the tile, and then filled it in again?

A. Yes, sir.

That is the way I ordinarily do when I am inspecting it. I have ordered the contractors to leave it open until I

could see the tile, but I didn't in this case. It was a little too deep. I didn't hear any report of blasting out there, but I saw where they had been blasting. I was there on an average about twice a week. They were never blasting when I was there. I saw broken rock. I do not think putting heavy boulders back on the tile would do any hurt if there was sufficient dirt under them, six inches or a foot. In making these progress estimates, I measured the amount of the finished job. I gave estimates for the tile to be delivered on the ground, and then estimates for the excavation or the labor. I would measure how many yards or feet of tile had been laid, and give an estimate on that basis. My estimates that I gave covered the full depth and the full distance.

The plaintiff testified as follows:

"It was not my idea to conceal the fact of the rock work until the final estimate. I first asked for an estimate on this rock work when I got my monthly estimate. I don't know how far I had got in the rock work when the engineer told me that his report would probably be rejected. It was in the fall of 1910, I think it was. Somewhere about the latter part of October or the first of November. After that talk with the engineer he continued to give me monthly statements or progress estimates based on the figures that I set forth in exhibit No. 3, and I continued to accept eighty per cent. The only time I spoke to the board of supervisors about my claim for rock work was when I asked the board of supervisors to come out and look at it. I didn't tell them I was demanding anything. I told them I was in rock. I never did go to the board to make a claim outside of through Mr. Price. The first man I ever went to on my claim for rock work was to the attorney beside Mr. Freimuth, the engineer. Freimuth didn't say that he wouldn't give me estimates on the rock work. He said he thought it would be better to wait, and sent it in at once, so we would know how much there was of it. He said that the probability would be that the board would

reject his report, and by holding up my estimates, that I wouldn't be able to draw my eight per cent probably in time, which I was needing to make my payroll. I never thought anything about that as a reason."

It is needless to say that there was no legal warrant for the agreement and understanding between the plaintiff and the engineer. Under the statute it was the duty of the engineer to make monthly estimates of the "value of the work done." The plaintiff should not be prejudiced by any mere failure of duty on the part of the engineer but he is chargeable with his own part in it. The plaintiff knew that his claim for rock work was not disclosed to the drainage board at a time when the board was entitled to know it and at a time when an investigation of the facts would be convenient and certain. Not only so, but he actively withheld knowledge of such claim by his arrangement with the engineer and he must now bear the weight of this fact as a circumstance against him. Under the circumstances indicated, the recommendation and estimate of the engineer are subject to scrutiny. The plaintiff is entitled to the benefit of his testimony but such testimony must be weighed like that of any other witness. When the engineer made the final estimate and report, his employment with the county supervisors had virtually ceased. His testimony herein is friendly to the plaintiff. Its value is much weakened by the fact that he himself did not estimate the rock work at the time it was actually done but made it at a later time and after the work had been fully covered. At that time he depended upon his sounding rod for the dimensions of the ditch and the presence of stone. Needless to say that such a measurement could not be as accurate as one made in the appropriate time. So far, therefore, as his conduct is concerned it did not, prior to such attempted measurement, indicate any intention to estimate the rock work. It may be noted here that items for extras were included in the monthly estimates as to other matters to a total of about $3,000.00 and

these were allowed in regular course by the board. The failure to include estimates for the rock work rests upon no pretense of reason except the belief that it would be rejected. It is not a question at this point as to whether such rejection would be right or wrong. The situation here presents either an active concealment by the plaintiff of his claim for rock work or else an acquiescence in the monthly estimates showing the value of the work done. This conduct assumes added importance by its relation to the oral construction put upon the term "rock work" at the time the plaintiff's bid was considered.

This suit was begun about one year after the filing of the claim. The defendants thereupon placed two engineers upon the course of the drain for the purpose of ascertaining as far as possible the character of the work. They caused holes to be dug to the full depth of the drain and immediately alongside thereof. These holes were 17 in number, 1,000 feet apart. They were all dug with spades. In some of these holes they found boulders. A few of these boulders were of such a size that they could be denominated in engineering parlance as rock work. The yardage thereof was estimated as 50% of 375. This was an uncertain method of measurement but none other was available to the defendants after they learned of plaintiff's claim. The plaintiff testified that he found his worst rock on the farms of Lynch and Mehring. On the other hand it appeared for the defendants that the owners of these lands were on the ground while the work was going on and discovered no rock work but occasional boulders only. Branch drains were laid by these owners on these farms and no rock work was encountered. Previous tile work had also been laid in this ground with like experience. This is not saying that the plaintiff did not have a difficult contract. A part of his trouble arose from sand and gravel and water and a part of it arose from boulders. Needless to say that any boulder of any size is a troublesome obstacle in the way of the digger of the ditch. The plaintiff used seventy

or eighty dollars worth of dynamite in breaking them up. However, the fact that there were more or less boulders upon the ground was known to all parties when the contract was made and this was the reason for the oral agreement as to what was "considered rock work." If there were boulders upon the surface of the ground, no further proof is needed that some boulders would be found in the ground. Taking the case in all its circumstances, we think it must be found that the parties agreed upon a construction that rock work should not be considered as including boulders but solid or ledge rock only. This conclusion gives consistency to the actual conduct of the plaintiff and the engineer in omitting the claims from the monthly estimates and gives consistency also to the mutual conduct of both parties throughout the period of performance.

The order entered below is therefore—*Affirmed.*

DEEMER, C. J., LADD and PRESTON, JJ., concur.